987 F.2d 1392
 Jay Lee GATES; Charles Edward Puett; John Ronald Betram,
Plaintiffs-Appellees,
v.
George DEUKMEJIAN, Governor, Defendant
and
James Rowland, Director, Nadim Khoury, M.D.; Eddie Ylst;
Kenneth Sheppard, M.D., Nicholas Poulos, Daniel Thor, Paul
Morentz, H. Benton, Bruce Baker, A.R. Rotella, D. Michael
O'Connor, Douglas G. Arnold, Clyde Murrey, Sylvia Blount,
Defendants-Appellants.
 No. 91-15270.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 11, 1992.
Decided Oct. 6, 1992.
As Amended on Denial of Rehearing March 2, 1993.
 
 John G. Donhoff, Jr., Deputy Atty. Gen., San Francisco, CA, for defendants-appellants.
 Samuel R. Miller and Sanford J. Rosen, Rosen, Bien & Asaro, San Francisco, CA, for plaintiffs-appellees.
 Appeal from the United States District Court for the Eastern District of California.
 Before: CHOY, FARRIS, and RYMER, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 A number of California state officials appeal the district court's award of over $6 million in attorneys' fees under 42 U.S.C. § 1988. We affirm the district court's decision in part, vacate and remand in part, and reverse in part.I. BACKGROUND
 
 
 2
 This dispute arises out of a complex class action suit brought by prisoners incarcerated at the California Medical Facility ("CMF") and the Main Northern Reception Center ("NRC") ("plaintiffs") against a number of California state officials ("defendants") in which plaintiffs challenged the alleged unconstitutional treatment of inmates at CMF and NRC.
 
 
 3
 The history of efforts to ameliorate problems at CMF predates initiation of this suit.[1] However, because these efforts were perceived as moving too slowly and as unlikely to ameliorate all the problems at the facilities, plaintiffs resolved to file the complaint in this case.[2]
 
 
 4
 On January 6, 1988 plaintiffs filed a complaint and motion for class certification in the district court.[3] Over the course of the following one and one-half years plaintiffs engaged in extensive discovery which, according to the district court, defendants resisted throughout. Defendants responded with an aggressive posture, for example, challenging the motion for class certification, arguing to limit discovery to class representatives, and filing a motion for summary judgment.[4]
 
 
 5
 Judge Raul Ramirez supervised settlement discussions in early 1989. The negotiations progressed over the course of three months; however, they ultimately broke down and terminated on June 5, 1989.[5] Trial began before Magistrate Judge John F. Moulds, and continued until the end of October 1989 when the parties again agreed to enter into settlement negotiations. Plaintiffs rested their case on October 30th and settlement negotiations began immediately and continued for two and one-half weeks concluding with final negotiations on November 16 and 17, 1989. The proposed settlement was signed on November 20, 1990 and Magistrate Judge Moulds issued his findings and recommendations in support of the consent decree on February 21, 1990. Judge Karlton adopted these and approved the consent decree on March 8, 1990.
 
 
 6
 The consent decree addresses the primary areas raised in the complaint including medical care, psychiatric care, conditions of confinement, and HIV inmates. It includes a minimum three-year reporting and mediation process designed to ensure proper plan development and implementation of the general provisions of the decree. Under the decree a mediator is appointed by the district court to assist the parties in developing plans of implementation and reports as required by the decree, to resolve disagreements regarding the adequacy of the plans or reports developed by the appellants under the decree, to mediate violations of the decree, and to submit findings and recommendations to the court for its approval.
 
 
 7
 Although the consent decree settled all disputes on the merits, it did not resolve the question of attorneys' fees. In this regard, the decree merely provided that plaintiffs may seek to recover reasonable costs, attorneys' fees, and other expenses pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794(b) for work performed prior to entry of the decree and reasonably performed during the pendency of the decree. After making an unsuccessful demand for fees, costs, and disbursements on defendants, on April 4, 1990 plaintiffs filed an Application for Attorneys' Fees and Costs with the district court.
 
 
 8
 On August 27th, after a hearing and prior to its final decision on the merits of plaintiffs' entire fees application, the district court issued two orders. In one the court ordered payment of $253,429.42 of out-of-pocket costs and disbursements since none of these were contested by the defendants. In the other, the court concluded that a minimum of $1 million in fees was not contested or seriously contestable and ordered that amount paid as an interim fee award. The court, however, declined to enforce payment of either the costs and disbursements or the interim award through a writ of execution.
 
 
 9
 On December 5, 1990 the district court granted plaintiffs' discounted fee request in full thus awarding the total remaining fees of $5,627,399.66.[6] On December 14, 1990 the district court entered an amended order correcting a mathematical error in the original December 5, 1990 order ("amended order").
 
 
 10
 In its amended order the district court held that the plaintiffs clearly were the prevailing party entitled to full attorneys' fees and costs and that defendants' arguments with regard to partial success were "patently frivolous." Amended Order at 7-8. It also found that "the lodestar amount is reasonable and justified by ample documentation," and that the ten percent across-the-board reduction in the lodestar figure compensated for any overbilling or duplication the court found suggested in the record. Id. at 5-6.
 
 
 11
 The court found that plaintiffs' counsel had demonstrated that their expertise in complex prison litigation required application of San Francisco rather than Sacramento rates and that plaintiffs adequately had documented that the rates their counsel charged were the prevailing market rates. The court added that defendants' arguments against these rates were also "patently frivolous." Id. at 6. The court further concluded that plaintiffs were entitled to receive current rather than historic rates in order to adjust for the delay in receiving their compensation. The court noted that plaintiffs adequately had documented that the 2.0 contingency multiplier was necessary to attract counsel, that 2.0 was the proper multiplier, and that the enhancement therefore was justified, especially in light of the obvious undesirability of the litigation.
 
 
 12
 Finally, the court considered defendants' non-compliance with its interim attorneys' fees award, granting plaintiffs' request for reconsideration, and amending its earlier order to allow for a writ of execution in light of defendants' refusal to voluntarily comply with the order.
 
 II. STANDARD OF REVIEW
 
 13
 We review a district court's determination regarding the proper amount of the attorneys' fees award under § 1988 for an abuse of discretion. Bouman v. Block, 940 F.2d 1211, 1235 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991); Cunningham v. County of Los Angeles, 879 F.2d 481, 487 (9th Cir.1988), cert. denied, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).
 
 III. ANALYSIS
 1. Lodestar Calculation
 
 14
 In its amended order the district court concluded that the lodestar amount was reasonable and justified by ample documentation. Moreover, it found that plaintiffs' discrete billing judgment reductions, coupled with their proposed ten percent across-the-board reduction in the lodestar, adequately compensated for any overbilling or duplication in the record. Finally, the court noted that "[d]espite finding the reduced lodestar reasonable from a record review," it had offered defendants the services of a special master as long as they bore the cost if the master concluded that the ten percent reduction was reasonable. Amended Order at 5. Defendants declined to accept the offer. On the basis of this refusal, the district court concluded that defendants conceded its finding that the ten percent reduction compensates for any currently identifiable overbilling.
 
 
 15
 On appeal, defendants urge that the district court abused its discretion in making these findings. Their specific objections are twofold.
 
 
 16
 First, defendants argue that the district court erred in selecting ten percent as the proper reduction. They contend that the district court abused its discretion in reducing the lodestar by that amount because it neither possessed nor articulated a reasoned basis for selecting ten percent, rather than some other figure.[7] Second, they argue that the district court abused its discretion in failing to review and make findings as to the merit of each of their specific objections to plaintiffs' billing judgment reductions and, on the basis of its independent review, to reduce plaintiffs' claimed hours accordingly.
 
 
 17
 Section 1988 authorizes a court "in its discretion" to "allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. The starting point for determining a reasonable fee is the "lodestar" figure, which is the number of hours reasonably expended multiplied by a reasonable hourly rate. City of Burlington v. Dague, --- U.S. ----, ----, 112 S.Ct. 2638, 2640, 120 L.Ed.2d 449 (1992); Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Although there is a strong presumption that the lodestar represents a reasonable fee, Dague, --- U.S. at ----, 112 S.Ct. at 2641; Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), reversed on other grounds after rehearing, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (Delaware Valley I ), the Supreme Court in Hensley noted that district courts
 
 
 18
 should exclude from this initial fee calculation hours that were not reasonably expended. Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice is ethically obligated to exclude hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here."
 
 
 19
 Hensley, 461 U.S. at 433-34, 103 S.Ct. at 1939-40 (citations omitted); see Riverside v. Rivera, 477 U.S. 561, 569, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1985).
 
 
 20
 The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. Hensley, 461 U.S. at 433, 437, 103 S.Ct. at 1939, 1941. The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits. Blum v. Stenson, 465 U.S. 886, 892 n. 5, 104 S.Ct. 1541, 1545, 79 L.Ed.2d 891 (1984); Toussaint v. McCarthy, 826 F.2d 901, 904 (9th Cir.1987).
 
 
 21
 In accordance with the principles set forth in Hensley, the lodestar figure in plaintiffs' fee application reflected discrete billing judgment reductions in the amount of $108,495.80 and proposed a ten percent across-the-board reduction in the lodestar. The discrete billing judgment reductions, which were made before and during the district court's review of plaintiffs' fee application, included reductions in hours billed as well as in rates charged. As proposed by plaintiffs, the ten percent reduction was intended to account for any overlap or duplication in work that had not already been accounted for through the discrete billing judgment reductions.[8]
 
 
 22
 Defendants submitted evidence to rebut plaintiffs' claimed reductions, asserting that the reductions were insufficient to account for five particular areas in which plaintiffs allegedly overbilled. Specifically, defendants argued and presented the district court with evidence that plaintiffs' calculation of the reasonable hours billed was incorrect in the following five respects: (1) it did not consider the fact that the case was "grossly overstaffed;" (2) a "huge percentage" of the time billed by McCutchen and Brobeck was "lumped," with a large number of hours reportedly billed to activities such as "meetings" or "pleadings and research" without allocating time to a particular task; (3) all the time spent by "inexperienced attorneys and, especially, summer students" was billed; (4) numerous specific duplicative court and deposition appearances were billed; and, (5) "enormous amounts of time" were billed for time co-counsel spent conferring with one another.
 
 
 23
 The district court has a great deal of discretion in determining the reasonableness of the fee and, as a general rule, we defer to its determination, including its decision regarding the reasonableness of the hours claimed by the prevailing party. Hensley, 461 U.S. at 437, 103 S.Ct. at 1941; Chalmers v. City of Los Angeles, 796 F.2d 1205, 1213 (9th Cir.1986), amended, 808 F.2d 1373 (9th Cir.1987). Despite this general deference, the district court is required to articulate not only the reasons for its findings regarding the propriety of the hours claimed or for any adjustments it makes either to the prevailing party's claimed hours or to the lodestar.
 
 In Hensley the Court noted:
 
 24
 We reemphasize that the district court has discretion in determining the amount of a fee award, This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award.
 
 
 25
 Hensley, 461 U.S. at 437, 103 S.Ct. at 1941 (emphasis added).
 
 
 26
 We have interpreted the Hensley "concise but clear" language as requiring the district court to give at least some indication of how it arrived at the amount of compensable hours for which fees were awarded to allow for meaningful appellate review. Cunningham, 879 F.2d at 485. Although we do not require "an elaborately reasoned, calculated, or worded order ... [and] a brief explanation of how the court arrived at its figures will do," id., "something more than a bald, unsupported amount is necessary." Chalmers, 796 F.2d at 1211 n. 3; Jordan v. Multnomah County, 815 F.2d 1258, 1263 (9th Cir.1987) ("[w]hile the district court is in the best position to judge the reasonableness of the fee award, ... such a position does not mean the trial judge can remain silent as to how she or he reached the 'reasonableness' conclusion (citation omitted)"); Sealey, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1385 (9th Cir.1984) (fees award vacated where it appeared that the court "accepted uncritically" the plaintiff's representations concerning the time expended on the case).[9]
 
 
 27
 Despite the "concise but clear" requirement, in cases where a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request. See, e.g., Jacobs v. Mancuso, 825 F.2d 559, 562 (1st Cir.1987); In re "Agent Orange" Product Liability Litigation, 818 F.2d 226, 237-38 (2d Cir.1987) ("no item-by-item accounting of the hours disallowed is necessary or desirable"); Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc., 776 F.2d 646, 657-58 (7th Cir.1985). Rather, as defendants concede, when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure "as a practical means of trimming the fat from a fee application." New York State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1146 (2d Cir.1983); Daggett v. Kimmelman, 811 F.2d 793, 797-98 (3d Cir.1987); Tomazzoli v. Sheedy, 804 F.2d 93, 97-98 (7th Cir.1986); Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1202-03 (10th Cir.1986) (77% reduction in hours).
 
 
 28
 Irrespective of its obvious utility, the percentage or, "meat-axe approach," nonetheless has been criticized when employed in cases where the fee applications at issue involved substantial amounts of money and where district courts failed adequately to articulate their reasons for selecting specific percentage deductions. In re Continental Illinois, 962 F.2d 566 (7th Cir.1992); Heiar, 746 F.2d at 1203-04; see In re Fine Paper Antitrust Litigation, 751 F.2d 562, 594-95 (3d Cir.1984).
 
 
 29
 Heiar, for example, involved a situation where the district court judge simply cut the fee request in half rather than indicating those parts of the fee petition he found excessive. In vacating the defendant's award, Judge Posner noted that
 
 
 30
 where as in this case the request is for a large amount of money [$50,000] ... the judge must do more than eyeball the request and if it seems excessive cut it down by an arbitrary percentage. He has to make a judgment--considering the nature of the case and the details of the request, taking evidence if need be, and defending his judgment in a reasoned (though brief) opinion--on what the case should have cost the party who submitted the request.
 
 
 31
 Id. at 1204.
 
 
 32
 Similarly, in Continental Illinois the Seventh Circuit reviewed the district court's handling of a $9 million fee application including its forty percent across-the-board cuts in the legal research and conferring categories. The appeals court concluded that the district court abused its discretion when it slashed broad categories of activity by arbitrary percentages "on the basis of his inarticulable and unsubstantiated dissatisfaction with lawyers' efforts to economize," rather than by disallowing specific items of unreasonable activity and providing examples of excessive time spent on legal research. Continental Illinois, 962 F.2d at 570. In so holding the court noted that such a method
 
 
 33
 won't do, especially when millions of dollars are at stake. The qualification is important: in small cases, the amount at issue in the request for lawyers' fees may be too slight to justify cutting with laser precision. The meat-axe approach (we called it "trimming fat from a fee application" in Tomazzoli v. Sheedy, supra, 804 F.2d at 98) may be acceptable in such a case. (The judge awarded only $6,000 in attorney's fees in Tomazzoli). It is true that in a large case, where the stakes in the attorney's fee are greater, so is the burden on the judge because the fee application will be longer and more complex.
 
 
 34
 Id.
 
 
 35
 Thus, percentages indeed are acceptable, and perhaps necessary, tools for district courts fashioning reasonable fee awards. However, decisions of district courts employing percentages in cases involving large fee requests are subject to heightened scrutiny and the use of percentages, in any case, neither discharges the district court from its responsibility to set forth a "concise but clear" explanation of its reasons for choosing a given percentage reduction nor from its duty to independently review the applicant's fee request.
 
 
 36
 Assessing the merit of defendants' contentions in light of these principles, we conclude that the district court abused its discretion. We therefore vacate and remand this portion of the district court's order for further proceedings consistent with this opinion.
 
 
 37
 As a preliminary matter, we reject defendants' argument that the district court abused its discretion in failing expressly to rule on each of their specific objections. The "concise but clear" explanation requirement mandates that the district court explain the reasons for its fees award; it does not demand that the court make findings as to each of defendants' specific objections to plaintiffs' billing judgment. Cf. Truck Terminals, Inc. v. Commissioner of Internal Revenue, 314 F.2d 449, 454-55 (9th Cir.1963) ("The fact that particular items of evidence were not mentioned in the findings or opinion of the Tax Court does not establish that they were not considered by that court").
 
 
 38
 Interpreting the "concise but clear" explanation requirement in this manner not only would result in unnecessary expenditure of precious, and already strained, judicial resources but would undermine the concise portion of that rule. As long as the district court supplies us with a sufficient understanding of the reasons for its decision additional exposition is unnecessary and we will presume that the district court implicitly rejected those specific challenges to plaintiffs' billing judgment deductions that it did not expressly discuss in its order.
 
 
 39
 We do conclude, however, that the district court here failed to articulate a "concise but clear" explanation for why the ten percent across-the-board reduction, when coupled with plaintiffs' discrete billing judgments, properly compensated for plaintiffs' overbilling or duplication. Absent some indication of how the district court exercised its discretion, we are unable to assess whether the court abused that discretion.
 
 
 40
 In its only statement regarding the ten percent figure, the district court concluded that
 
 
 41
 [t]he amount of time spent appears to be reasonable. In light of the legal and factual complexity of this action, counsel's division of labor was justified and some duplication of effort was unavoidable. Determining with any precision what hours were duplicative, and what duplicative hours were unavoidable, is impossible from a paper record. Plaintiff's concessions and across-the-board reduction compensate for any overbilling which the court finds suggested in the current record.
 
 
 42
 Amended Order at 5. This cursory statement affords us no explanation as to how the court arrived at ten percent as the correct reduction and thus, it does not allow for us meaningfully to assess its determination.
 
 
 43
 Integrally related to the district court's failure to provide an adequate explanation for the ten percent reduction, the district court abused its discretion when it seemingly uncritically accepted plaintiffs' suggested reductions and failed independently to review the record, even in a limited manner, in order to substantiate the accuracy of those reductions.
 
 
 44
 Although Judge Karlton's amended order contains a number of statements indicating that he independently reviewed plaintiffs' fee application to determine whether the proposed reductions were adequate,[10] ] other evidence in the record, especially when coupled with the absence of sufficient findings, strongly indicates that the district court, in fact, conducted no such inquiry.
 
 
 45
 We find the record of the August 27, 1990 hearing, at which the ten percent reduction was discussed at length, particularly telling in this regard. See Reporter's Transcript, Aug. 27, 1990 Hearing at 7-15 ("August 27th RT"). At the hearing, for example, the following colloquy took place:
 
 
 46
 THE COURT: ... I am much taken with your suggestion that the court can avoid spending the rest of its life worrying about every half hour billed on the theory that plaintiffs have taken a 10 percent discount for possible overbilling, double billings and the errors that human beings make. I think that's a very sensible way of proceeding, There are two questions that I have to ask you about that way of proceeding, one, is there any authority for it? And, two, why 10 percent? Why not 9 or 11? Do you see what I am saying? ...
 
 
 47
 MR. ROSEN: ... We discussed it, and the actual discussion among counsel, should it be 5 percent or should it be 10 percent? Frankly, we selected 10 percent because of the very large size of the Lode Star [sic]. Because there were a large number of offices involved, because there was some unavoidable duplication which may have been unnecessary in retrospect, and we erred on the high side, in addition to more than $100,000 in discreet [sic] billing judgments that we provided. That's basically how we selected it....
 
 
 48
 THE COURT: (addressing Mr. Cuneo for the Government) Counsel? Why isn't that a sensible thing for any judge who is faced with this level of concern to adopt? Just say, look, unless you can show that there was intentional manipulation, that all they have done is, in effect, built-in a 10 percent discount and took it--
 
 
 49
 August 27th RT (emphasis added). Judge Karlton's following remark also is revealing:
 
 
 50
 The reality is, that where there are significant disputes concerning whether or not 10 percent will adequately address the problem of mistaken error, I just don't know whether I am free under the law to avoid the task of spending the rest of my life examining this billing. On the other hand, nobody in his right mind could believe that that's the appropriate way to proceed.
 
 
 51
 Id. at 13:9-16.
 
 
 52
 The lack of even a brief explanation of how and why Judge Karlton selected ten percent and the fact that the record not only fails to illuminate the court's reasoning but casts doubt on the very existence of such a rationale, leads us to the ineluctable conclusion that the district court, faced with an admittedly voluminous paper record, threw up its hands and relied on plaintiffs' suggested, yet admittedly arbitrary, ten percent figure without itself reviewing the record.
 
 
 53
 The district court's proposal to defendants regarding the special master makes its abuse of discretion here all the more pronounced. Not only is the district court required to independently review plaintiffs' fee request even absent defense objections, but upon submitting their rebuttal evidence to plaintiffs' claimed reasonable hours, defendants were entitled to have the district court review both their objections and plaintiffs' claimed hours. Judge Karlton's proposal effectively forced the defendants to take a gamble if they wanted to obtain the record review that the district court was obliged to give them in the first place.[11]
 
 
 54
 Because the district court neither provided this court with a "concise but clear" explanation of its reasons for selecting the ten percent figure nor independently reviewed plaintiffs' fee application, we vacate its determination of the reasonable lodestar amount and its findings that plaintiffs' discrete billing judgment reductions and ten percent across-the-board reduction in the lodestar compensated for any overbilling or duplication. We remand the matter to the district court to reassess the reasonableness of the requested fee in accordance with the above principles.
 
 
 55
 Because the review of such a voluminous fee request is a daunting task, the district court may consider returning the case to Magistrate Judge Moulds because, as the district court itself noted at the beginning of the August 27th hearing, of his greater familiarity with this case.
 
 2. Adjustments to the Lodestar
 
 56
 In addition to billing judgment reductions, in rare cases, a district court may make upward or downward adjustments to the presumptively reasonable lodestar on the basis of those factors set out in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70 (9th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974)), that have not been deemed subsumed in the lodestar calculation. Delaware Valley I, 478 U.S. at 564-65, 106 S.Ct. at 3098; Blum, 465 U.S. at 897-90, 104 S.Ct. at 1549; Hensley, 461 U.S. at 434, 103 S.Ct. at 1939; Cunningham, 879 F.2d at 484.[12]
 
 
 57
 Defendants argue that the district court erred when it increased plaintiffs' fee award twofold by employing a multiplier to account for the fact that their counsel was retained on a contingency fee basis. They also argue that the district court erred in failing to reduce the fee award based upon plaintiffs' limited or partial success.
 
 
 58
 In its amended order, the district court noted that the lodestar may be adjusted upward to compensate for contingent risk factor and cited the Supreme Court's decision in Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (Delaware Valley II ) as support. The court also noted that plaintiffs must show that, without the promise of a multiplier, they would have faced substantial difficulties locating counsel.
 
 
 59
 Citing our decision in Fadhl v. City & County of San Francisco, 859 F.2d 649 (9th Cir.1988), the court found that the San Francisco legal community compensates for the contingency factor in this litigation by allowing a multiplier of two. The court found that plaintiffs' attorneys adequately "documented the market custom of providing enhancers, the necessity of a multiplier in attracting counsel, and their reliance upon a potential enhancer in accepting representation." Amended Order at 7. Finally, the court concluded that the 2.0 enhancer was justified "especially in light of the obvious undesirability of the litigation." Id.
 
 
 60
 After briefing in this case the Supreme Court granted certiorari in Dague v. City of Burlington, 935 F.2d 1343, 1359-60 (2d Cir.1991), cert. granted in part, --- U.S. ----, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992) (U.S. S.Ct. Docket No. 91-810). We withdrew submission of this case in order to await the Supreme Court's decision in Dague.
 
 
 61
 In Dague the Supreme Court addressed whether, in determining an award of attorney's fees under section 7002(e) of the Solid Waste Disposal Act, 90 Stat. 2826, as amended 42 U.S.C. § 6972(e), or section 505(d) of the Federal Water Pollution Control Act, 86 Stat. 889, as amended, 33 U.S.C. § 1365(d), a court "may enhance the fee above the 'lodestar' amount in order to reflect the fact that the party's attorneys were retained on a contingent-fee basis and thus assumed the risk of receiving no payment at all for their services." City of Burlington v. Dague, --- U.S. ----, ----, 112 S.Ct. 2638, 2639, 120 L.Ed.2d 449 (1992).
 
 
 62
 In its June 24, 1992 opinion in Dague the Court answered this query with a resounding "no," when it held "that enhancement for contingency is not permitted under the fee shifting statutes." Id. at ----, 112 S.Ct. at 2643-44. Although the Solid Waste Disposal and Federal Water Pollution Control Acts and not § 1988 were at issue in Dague, the Dague Court expressly noted that the language of both of these sections "is similar to that of many other federal fee-shifting statutes, see, e.g., 42 U.S.C. §§ 1988, 2000e-5(k), 7604(d); our case law construing what is a 'reasonable' fee applies uniformly to all of them." Id. at ----, 112 S.Ct. at 2641 (citing Flight Attendants v. Zipes, 491 U.S. 754, 758 n. 2, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989)).
 
 
 63
 Given the Court's holding in Dague, it is clear that contingency multipliers are no longer permitted under § 1988. Thus, we reverse the portion of the district court's amended order awarding a 2.0 contingency multiplier in this case.
 
 
 64
 Defendants also contend that the district court abused its discretion in failing to reduce the lodestar because plaintiffs only achieved partial success. In the district court they argued, and here they reiterate, that plaintiffs only achieved partial success because the consent decree did not address or incorporate a number of the allegations in plaintiffs' second amended complaint and did not include many of the specific proposals contained in plaintiffs' proposed injunction.
 
 
 65
 In the amended order under the heading "Partial Success," the district court responded to defendants' argument stating that: "[p]laintiffs are clearly a prevailing party entitled to full attorneys' fees and costs. Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). It long has been the law that obtaining relief through a consent decree does not alter prevailing party status. Maher v. Gagne, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); Hanrahan v. Hampton, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). Defendants' arguments with regard to partial success are patently frivolous." Amended Order at 4-5.
 
 
 66
 In order to recover attorneys' fees under § 1988 a party must be a "prevailing party." Hensley, 461 U.S. at 433, 103 S.Ct. at 1939. Defendants here concede that plaintiffs are a prevailing party. A determination that a party has prevailed, however, does not preclude a determination that the prevailing party, nonetheless, has achieved partial or limited rather than complete success. In other words, the prevailing party is not automatically deemed to have attained complete rather than partial success. Rather, the partial success determination is part of the district court's secondary inquiry into what fee is reasonable in a given case. Id. at 434-35, 103 S.Ct. at 1940. As the Hensley Court noted: "That the plaintiff is a 'prevailing party' ... may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved." Id. at 436, 103 S.Ct. at 1941.
 
 
 67
 We agree with defendants that a plain reading of the district court's partial success findings indicates that the court based its conclusion that defendants' partial success claim was frivolous solely on the fact that the plaintiffs were the prevailing party. Moreover, because the prevailing party and partial or limited success inquiries are distinct, the record indicates that the district court's analysis regarding partial success is erroneous as a matter of law. Given this error, we vacate the district court's findings regarding partial success and remand to the district court in order for it to revisit this issue.
 
 
 68
 In an effort to assist the district court in its reassessment of this question, we note that a number of principles should guide its inquiry.
 
 
 69
 In Hensley the Supreme Court noted that the "results obtained" was one factor that might lead the district court to adjust the presumptively reasonable lodestar calculation and that this factor "is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded only on some of his claims for relief." Id. at 434, 103 S.Ct. at 1940. The Hensley Court set out a comprehensive framework for assessing the effect of a prevailing party's results obtained or partial success on the calculation of a fee award. The district court first asks if the plaintiff did not prevail on claims that were unrelated to those on which he succeeded and excludes any fees associated with those unsuccessful claims. Second, the court makes further reductions when plaintiffs' success on any remaining interrelated unsuccessful and successful claims was limited. Id.
 
 
 70
 In subsequent decisions modifying the Hensley holding, the Court has held that "the 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee." Blum, 465 U.S. at 900, 104 S.Ct. at 1549; Delaware Valley I, 478 U.S. at 565, 106 S.Ct. at 3098; Corder v. Gates, 947 F.2d 374, 378 (9th Cir.1991); Cunningham, 879 F.2d at 488; Jordan, 815 F.2d at 1262 & n. 6. Thus, the favored procedure is for the district court to consider the extent of the plaintiff's success in making its initial determination of hours reasonably expended at a reasonable rate, and not in subsequent adjustments to the lodestar figure. Corder, 947 F.2d at 378; Cabrales v. County of Los Angeles, 864 F.2d 1454, 1464 (9th Cir.1988).
 
 
 71
 Particularly notable in light of defendants' argument that plaintiffs' success was limited because the consent decree does not mirror the second amended complaint and the proposed injunction, is the Supreme Court's rejection in Hensley of "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon" to the determination of whether fees should be reduced to account for limited or partial success. Hensley, 461 U.S. at 435 n. 11, 103 S.Ct. at 1940 n. 11; Toussaint v. McCarthy, 826 F.2d 901, 905 (9th Cir.1987); Greater Los Angeles County on Deafness v. Community Television, 813 F.2d 217, 222 (9th Cir.1987). It is clear that a litigant need not prevail on every claim in order to receive a full fee. Id. at 220. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not sufficient reason for reducing a fee. The result is what matters." Hensley, 461 U.S. at 435, 103 S.Ct. at 1940 (emphasis added).
 
 
 72
 Finally, a district court should not reduce the lodestar merely because the prevailing party did not receive the type of relief that it requested. Hensley, 461 U.S. at 435 n. 11, 103 S.Ct. at 1941 n. 11;[13] City of Riverside v. Rivera, 477 U.S. 561, 574-75, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986); Quesada v. Thomason, 850 F.2d 537, 540 (9th Cir.1988); Jordan, 815 F.2d at 1262 & n. 6. This is especially true in civil rights cases. Riverside, 477 U.S. at 574-75, 106 S.Ct. at 2694; Romberg v. Nichols, 953 F.2d 1152, 1167 (9th Cir.1992); see also Blanchard v. Bergeron, 489 U.S. 87, 95, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989).
 
 3. Attorneys' Fee Rates
 
 73
 A. San Francisco versus Sacramento Hourly Rates
 
 
 74
 Defendants contend that the district court erred in awarding hourly rates comparable to prevailing rates in San Francisco. They argue that, because Sacramento attorneys with sufficient experience to handle the case were able and willing to represent the plaintiffs, the district court should have employed the prevailing rates for Sacramento when calculating the fee.
 
 
 75
 The district court held that the plaintiffs adequately had documented that their expertise in complex prison litigation required application of San Francisco rates and that the rates they charged are the prevailing market rates. It also concluded that defendants' arguments against the rates charged, "such as the availability of Sacramento personal injury lawyers ... [are] patently frivolous." Amended Order at 6.
 
 
 76
 Reasonable fees under § 1988 are calculated according to the prevailing market rates in the relevant legal community, Blum, 465 U.S. at 895, 104 S.Ct. at 1547, and the general rule is that the rates of attorneys practicing in the forum district, here the Eastern District of California--Sacramento, are used. Davis v. Mason County, 927 F.2d 1473, 1488 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991).[14] Although we have not ruled on the issue, a number of circuits have held that rates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case. See, e.g., McDonald v. Armontrout, 860 F.2d 1456, 1459-60 (8th Cir.1988); Polk v. New York State Dept. of Correctional Servs., 722 F.2d 23, 25 (2d Cir.1983); Louisville Black Officers Org., Inc. v. Louisville, 700 F.2d 268, 278 (6th Cir.1983); Chrapliwy v. Uniroyal, Inc., 670 F.2d 760, 768-69 (7th Cir.1982), cert. denied, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); see also National Wildlife Federation v. Hanson, 859 F.2d 313, 317-18 (4th Cir.1988); Maceira v. Pagan, 698 F.2d 38, 40 (1st Cir.1983).
 
 
 77
 Defendants attempt to distinguish these cases by arguing that the evidence presented to the district court failed to establish that Sacramento law firms were unwilling or unable to represent the plaintiff class or sub-class. They contend that, although "all the pleaded issues together amounted to a comprehensive conditions of confinement and health care case," the evidence that they introduced into the record as compared to "plaintiffs' counsels' self-serving declarations," proved that two or more Sacramento firms could have handled the case exactly as did plaintiffs' counsel.
 
 
 78
 We conclude that the district court did not abuse its discretion in awarding fees at San Francisco rates. Plaintiffs offered substantial evidence demonstrating that the issues in prisoner civil rights cases are extremely complex and thus require experienced and sophisticated counsel. They offered numerous declarations of San Francisco and Sacramento attorneys which directly support their contention that Sacramento attorneys and law firms with the requisite expertise and experience to handle this type of complex institutional prison reform litigation were unavailable.[15] Defendants' proof that Sacramento attorneys were capable of handling a case of this complexity consisted of three declarations of partners in major Sacramento insurance defense and commercial litigation firms. These declarations, however, do not persuasively rebut plaintiffs' overwhelming contrary proof that Sacramento firms could not successfully have provided the expert representation required to effectively represent the litigants in this matter.[16] Although the district court may have selected words that were too strong when it found defendants' argument that personal injury attorneys adequately could handle this case "patently frivolous," given the record we cannot say that the district court abused its discretion by awarding fees at San Francisco rates on the ground that Sacramento attorneys with adequate expertise were unavailable.
 
 B. Historic Versus Current Rates
 
 79
 Defendants also contend that the district court abused its discretion when it awarded plaintiffs current (then 1990) San Francisco community rates rather than historic rates.
 
 
 80
 In awarding fees at current rather than historic rates the district court cited Missouri v. Jenkins ex rel. Agyei, 491 U.S. 274, 283-84, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) and noted that "plaintiffs' counsel began preparing this lawsuit over three years ago. Since that time they have expended an enormous amount of time and money without compensation. An award based on current rates is reasonable to adjust for this delay." Amended Order at 6-7.
 
 
 81
 In Jenkins the Court observed that "[c]learly, compensation received several years after the services were rendered--as it frequently is in complex civil rights litigation--is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." Jenkins, 491 U.S. at 283, 109 S.Ct. at 2469. Thus, the Court held that an adjustment for delay in payment is an appropriate factor in determining what constitutes a reasonable attorneys' fee under § 1988 and "that an appropriate adjustment for delay in payment-whether by application of current rather that historic rates or otherwise--is within contemplation of the statute." Id. at 284, 109 S.Ct. at 2469.
 
 
 82
 We long have recognized that district courts have the discretion to compensate prevailing parties for any delay in the receipt of fees by awarding fees at current rather than historic rates in order to adjust for inflation and loss of the use funds. Bouman, 940 F.2d at 1235; Jordan, 815 F.2d at 1262 n. 7; Suzuki v. Yuen, 678 F.2d 761, 763 (9th Cir.1982); accord King v. Palmer, 906 F.2d 762, 769 (D.C.Cir.1990); Iqbal v. Golf Course Superintendents Ass'n of America, 900 F.2d 227, 228 (10th Cir.1990); Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1060 (2d Cir.1989). A fee award at current rates is intended to compensate prevailing attorneys for lost income they might have received through missed investment opportunities as well as lost interest. See, e.g., Jenkins, 491 U.S. at 283 n. 6, 109 S.Ct. at 2469 n. 6; Bouman, 940 F.2d at 1235. The record reflects that plaintiffs' counsel presented evidence that their work on this case precluded them from engaging in substantial work on other cases that would have paid at full market rates. These potential earnings, like interest payments and investment opportunities foregone, are deserving of compensation.
 
 
 83
 Defendants' argument that an interest adjustment would have been sufficient to compensate for the delay in this case similarly is unavailing. As defendants correctly note, Jenkins does not require an enhancement for delay under all circumstances, but rather permits an adjustment "where appropriate."[17] Id. at 281, 284, 109 S.Ct. at 2468, 2469 ("within the contemplation of the statute"); see Huntington Branch NAACP v. Huntington, New York, 961 F.2d 1048, 1049 (2d Cir.1992). The Jenkins Court, however, made clear that the district court has the discretion to choose the method by which it will adjust the fee to compensate for delay in payment and that it may do so "by adjusting the fee based on historical rates to reflect its present value," or "otherwise." Jenkins, 491 U.S. at 282, 109 S.Ct. at 2468 (citing with approval Delaware Valley II, 483 U.S. at 716, 107 S.Ct. at 3082); Romberg, 953 F.2d at 1164 (citing Jenkins and remanding because interest adjustment should have been considered to compensate for delay).[18] Thus, the district court's determination to adjust to current rates rather than to make an interest adjustment squarely was within the bounds of its discretion.
 
 
 84
 Finally, the length of the delay in payment indeed is a consideration in deciding whether an award of current rather than historic rates is warranted. See, e.g., Chalmers, 796 F.2d at 1215 (five year delay in payment of $149,785); Smith v. Freeman, 921 F.2d 1120, 1122-23 (10th Cir.1990) (fourteen months delay in payment of $8,139). Defendants' argument, however, that the delay in this case was too short to justify a current rates award is unconvincing. Plaintiffs' attorneys have waited over three years to be compensated. This delay is particularly onerous given that the fees awarded in this case, even without the 2.0 multiplier, runs in the millions of dollars.[19]
 
 
 85
 For the above reasons, we affirm the district court's award of current San Francisco rates.
 
 4. Expert Witness Fees as Costs
 
 86
 Defendants contend that in light of the Supreme Court's decision in West Virginia University Hospital, Inc. v. Casey, --- U.S. ----, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), which was decided on March 19, 1991 after the district court entered its Amended Order, the district court's award of tens of thousands of dollars in expert witness fees to plaintiffs as costs was clearly erroneous and must be reversed. We agree.
 
 
 87
 Included among the costs awarded plaintiffs' counsel was $93,089.12 (out of a total costs and expenses in the amount $345,732.76) all of which was designated under the category "expert witnesses." In Casey the Court held that § 1988 does not convey authority to shift expert fees in civil rights litigation to the losing party and that when experts appear at trial they are eligible for the fee provided by 28 U.S.C. §§ 1920 and 1821, but that the prevailing party may not be awarded more than this amount for expert witnesses' trial testimony and is not entitled to anything for services rendered by experts in a nontestimonial capacity. Casey, --- U.S. at ----, 111 S.Ct. at 1148.
 
 
 88
 Plaintiffs argue that defendants have waived their right to raise the issue of expert witness fees because they failed first to present it to the district court. As a general rule, we will not consider issues raised for the first time on appeal. United States v. Childs, 944 F.2d 491, 495 (9th Cir.1991) (citing United States v. Hayden, 860 F.2d 1483, 1485 (9th Cir.1988)). In our discretion, however, we may address a new issue raised for the first time on appeal if it "arises while the appeal is pending because of a change in law." United States v. Carlson, 900 F.2d 1346, 1349-50 (9th Cir.1990). Here, because the Casey decision was rendered after the district court entered its December 14, 1990 order and it changed the law with regard to compensation for expert witness fees under § 1988 we exercise our discretion to address defendants' argument.[20]
 
 
 89
 We conclude that, given the Supreme Court's decision in Casey, the district court's award of expert witness fees cannot stand. Thus, we remand to the district court with instruction to modify the award of expert witness fees as costs in accordance with Casey.
 
 
 90
 5. Writ of Execution for Interim Fees and Total Fee Award
 
 
 91
 Defendants' final contention is that the district court erred in issuing a writ of execution permitting plaintiffs to collect the $1 million in interim attorneys' fees that it awarded in its August 27, 1990 interim order before the California State Legislature was given an opportunity to appropriate the funds for the award.[21] They argue that our decision in Spain v. Mountanous, 690 F.2d 742 (9th Cir.1982) prohibits issuance of such a writ because it is inconsistent with principles of federalism.
 
 A. Mootness
 
 92
 Defendants concede that once the writ issued they paid the fees awarded in the district court's interim fee order rather than seeking a stay on enforcement of the writ of execution under Federal Rule of Civil Procedure 27. They also concede that, because they already have paid the interim fees award, under normal circumstances they would not be permitted to challenge the district court's authority to issue that writ because the question would be moot. Nonetheless, they argue that the issue is not moot under the exception to the mootness doctrine for cases "capable of repetition yet evading review." Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).
 
 
 93
 Two criteria must be met for a case to fall within this exception. First, the challenged action must be of inherently short duration, a period too brief for effective judicial review, and second, the party who is raising the challenge must have a reasonable expectation that he will be subjected to the same type of action again. Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 347, 46 L.Ed.2d 350 (1975); Barilla v. Ervin, 886 F.2d 1514, 1519 (9th Cir.1989).
 
 
 94
 We conclude that defendants' argument fails under our decisions in In re Combined Metals Reduction Co., 557 F.2d 179, 191 (9th Cir.1977) and In re Bunker Ltd. Partnership, 820 F.2d 308 (9th Cir.1987). In Bunker we clarified our holding in Combined Metals noting that under that decision
 
 
 95
 a party may not profit from the "capable of repetition yet evading review" exception to mootness, where through his own failure to seek and obtain a stay he has prevented an appellate court from reviewing the trial court's decision. The exception was designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where the failure of parties to take actions has precluded review as a practical matter.
 
 
 96
 Id. at 311 (citations omitted). Because, as defendants admit, they did not seek a stay under Rule 27 their own inaction essentially was the only reason that writ evaded our review. Similarly, if the district court were to issue a writ of execution permitting plaintiffs to collect the fees awarded in its Amended Order, that writ would only evade our review if the defendants again failed to obtain (or at least attempted to obtain) a stay under Rule 27. Thus, because under the above decisions the defendants may not take advantage of the "capable of repetition yet evading review" exception to the mootness doctrine. Their claim here, therefore, is moot and we lack jurisdiction to address whether the district court possessed authority to issue a writ of execution before the California Legislature denied appropriation of the interim fee award.
 
 B. Ripeness
 
 97
 Defendants admit that the district court has not yet issued a writ of execution permitting collection of the unpaid fees awarded in its final Amended Order and plaintiffs correctly note that the district court's Periodic Fees Order does not include a writ of execution provision in the event of nonpayment. Defendants argue, however, that because the Periodic Fees Order contains another "unrealistic deadline" for payment of the final fee award the district court inevitably will issue a writ of execution for payment of those funds, and that this court, therefore, should rule on whether the district court's issuance of such a writ would be permissible.
 
 
 98
 We refuse to decide this question because it is not yet ripe for determination and thus, under Article III of the Constitution, we lack jurisdiction to rule on its merit. The ripeness inquiry asks whether the issues are fit for judicial decision and whether the parties will suffer hardship if the court does not consider the issues. Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977); State of California ex rel. Water Resources Control Bd. v. F.E.R.C., 966 F.2d 1541, 1562 (9th Cir.1992); Western Oil & Gas Ass'n v. Sonoma County, 905 F.2d 1287, 1290 (9th Cir.1990) (ripeness inquiry asks "whether there is yet a need for the court to act"), cert. denied, --- U.S. ----, 111 S.Ct. 784, 112 L.Ed.2d 846 (1991).
 
 
 99
 This issue is not fit for judicial resolution. The harm to defendants is speculative and hypothetical rather than direct or immediate because the district court has not even threatened to issue a writ and, if the California Legislature appropriates the funds required to pay the judgment, the writ never will issue. Abbott Labs., 387 U.S. at 152, 87 S.Ct. at 1517. Moreover, defendants have failed to demonstrate that they will suffer any hardship if we wait to review this question after, and if, the district court in fact issues a writ.
 
 
 100
 Thus, because the question of the district court's authority to compel defendants to pay the final fees award without first permitting the legislature an opportunity to appropriate the funds as promised, is unripe we are without jurisdiction to reach its merit.
 
 IV. CONCLUSION
 
 101
 In conclusion, we affirm the district court's determination regarding current San Francisco rates. In light of the Supreme Court's decision in City of Burlington v. Dague, --- U.S. ----, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), we reverse the district court's decision to employ a 2.0 contingency enhancement. Moreover, given the Court's decision in West Virginia University Hospital v. Casey, Inc., --- U.S. ----, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), we also reverse the district court's award of expert witness fees as costs and remand for the court to modify its costs award accordingly.
 
 
 102
 Furthermore, we vacate the district court's determination regarding the reasonableness of plaintiffs' proposed discounted lodestar, including its findings that the across-the-board ten percent reduction in the lodestar and plaintiffs' discrete billing judgment reductions were adequate to compensate for any overbilling or duplication in the record and remand to the district court for further proceedings consistent with this opinion. We also vacate the district court's determination regarding partial success and remand this question for reexamination as well.
 
 
 103
 Finally, because defendants' arguments regarding the writs of execution for interim attorneys' fees and the final fee order respectively are moot and unripe, we are without jurisdiction to rule on their merits.
 
 
 104
 AFFIRMED IN PART AND REVERSED AND REMANDED IN PART. Costs on this appeal are awarded to defendants/appellants.
 
 
 105
 In 1984 in Durggan v. McCarthy, Sacramento Superior Court No. 326371, Alameda County Legal Aid alleged that the California Department of Corrections ("CDC") was providing in-patient medical and psychiatric care without an acute care hospital license as required under California law. CMF eventually was issued a license and the case subsequently was dismissed. In 1985 the United States Department of Justice ("USDOJ") commenced an investigation at CMF under the Civil Rights of Institutionalized Persons Act (CRIPA ), 42 U.S.C. § 1997. In January 1987 the USDOJ issued findings that medical and psychiatric care, environmental conditions, and overcrowding at CMF were constitutionally deficient.
 
 
 
 [2]
 Prison Law Office ("PLO") and McCutchen, Doyle, Brown & Enerson ("McCutchen") were the two firms initially involved in preparing the first draft of plaintiffs' complaint. Brobeck, Phleger & Harrison ("Brobeck") and the American Civil Liberties Union of Northern California ("ACLU") joined as plaintiffs' attorneys in the summer of 1987 and Rosen, Bien & Asaro ("Rosen") in the fall of 1988 when the complexity and difficulty of representing the HIV subclass became apparent
 
 
 [3]
 The complaint challenged as constitutionally deficient under the Eighth and Fourteenth Amendments, 42 U.S.C. § 1983, and 29 U.S.C. § 794 medical and psychiatric care, indecent conditions of confinement--particularly overcrowding--and segregated housing and treatment of HIV infected inmates at CMF and NRC
 
 
 [4]
 The district court found that defendants' litigation posture contributed to the amount of time plaintiffs' attorneys expended between filing of the complaint and the trial
 
 
 [5]
 Why settlement talks foundered is unclear. Plaintiffs contend that they failed because CDC flatly refused to enter into a consent decree. Defendants argue that they failed due to plaintiffs' insistence on settling all issues together--rather than bifurcating the HIV segregation and general conditions issues on which progress was not being made--and because they wanted the consent decree to include issues that defendants believed were resolved already in CRIPA and Durggan
 
 
 [6]
 This figure was computed as follows:
 $3,313,699.83 discounted lodestar
 x 2 enhancer
 -------------
 $6,627,399.66 subtotal
- $1,000,000.00 interim fee award
 -------------
 $5,627,399.66 Total remaining fees
 
 
 [7]
 Related to this claim, defendants also urge that the district court abused its discretion when, after accepting as reasonable and without scrutiny plaintiffs' proposed reductions, it offered to send the fee application to a special master but only if defendants footed the bill for those services if the master concluded that plaintiffs' ten percent reduction was adequate
 
 
 [8]
 The ten percent reduction amounted to $368,188.87 which, with the discrete reductions, meant a total reduction in the fee award before the 2.0 multiplier of $476,684.67 and of $953,369.34 in the final enhanced award
 
 
 [9]
 Accord Heiar v. Crawford County, 746 F.2d 1190, 1204 (7th Cir.1984), cert. denied, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985); Wojtkowski v. Cade, 725 F.2d 127, 130 (1st Cir.1984); National Ass'n of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1327 (D.C.Cir.1982)
 
 
 [10]
 These include statements that he found the reduced lodestar "justified by ample documentation," and "reasonable from a record review." Amended Order at 5:7 & 5:23
 
 
 [11]
 Plaintiffs argue that because defendants had the opportunity to stipulate to having the fees matter determined by Magistrate Judge Moulds at the commencement of the August 27, 1990 hearing and refused to do so they cannot argue here that the district court should have referred the fees dispute to a magistrate judge
 Plaintiffs' contention is unsound. Undoubtedly if defendants had known that Judge Karlton was going to deny them his own review of the record and instead require them to take the risk under his proposal if they wanted a review of any kind, they would have stipulated at the outset. Plaintiffs' counsel are asking us unfairly to judge defendants' actions with twenty-twenty hindsight.
 
 
 [12]
 The Johnson- Kerr factors include: (1) the time and labor required; (2) the novelty and difficulty of the issues involved; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by an attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by a client or the circumstances; (8) the amount in question and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and, (12) awards in similar cases. Kerr, 526 F.2d at 70; United States Steel Workers v. Phelps Dodge Corp., 896 F.2d 403, 406 n. 3 (9th Cir.1990)
 
 
 [13]
 Thus, "a plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time." Id
 
 
 [14]
 Defendants concede that if San Francisco market rates are applicable plaintiffs' requested rates are accurate
 
 
 [15]
 San Francisco attorney Steven Mayer's declaration is representative:
 It is my understanding that, for a variety of reasons such as the complexity of the case, and its contingent character, this case was too big for even the biggest private law firms in San Francisco ... to handle on an individual basis, even with the expert assistance of counsel from the [PLO] ... and [ACLU].... For this reason, it is understandable that plaintiffs' counsel concluded that there were no firms or attorneys in Sacramento capable, either singly or in combination, of taking on this case.
 Mayer Decl. at p 15.
 
 
 [16]
 Defense declarant Franklin in one sentence notes that she is involved in a jail conditions case in Lassen County but offers neither information regarding the scope or complexity of that case nor an opinion regarding the ability of her firm or other Sacramento firms to take on complex contingent institutional prison reform cases like Gates. Defense declarant Murphy merely noted that "many attorneys and law firms in the Sacramento community ... have the expertise and resources to provide representation in ... [section 1983 cases]" and declarant Birney, whose firm is involved in complex medical malpractice cases, stated that "[w]ith respect to issues concerning allegations of professional malpractice, including medical and psychiatric care" many Sacramento firms have the expertise and resources to handle such cases
 
 
 [17]
 Defendants claim that the district court mistakenly believed that it was required to apply current rates under Jenkins. The district court's order, however, bears no indication that the court misunderstood Jenkins in this fashion
 
 
 [18]
 Adjusting the fee based on historic rates to reflect present value essentially describes adjustment of fees for inflation. Oklahoma Aeronautics, Inc. v. United States, 943 F.2d 1344, 1348-49 (D.C.Cir.1991)
 
 
 [19]
 Defendants attempt to argue that the award of $1 million in interim attorneys' fees somehow cushioned the impact of this delay. In Jenkins the Court noted that "in economic terms, such an interim award does not differ from enhancement for delay in payment." Jenkins, 491 U.S. at 283-84 n. 6, 109 S.Ct. at 2469 n. 6. This argument, however, lacks force given the facts of this case. First, the interim award of $1 million only compensated for a small portion (less than one-sixth) of the total fees awarded plaintiffs. Second, payment of the interim award was delayed for over eight months because the defendants failed to comply with the district court's March 27, 1990 order until the court issued a writ of execution in December 5, 1990
 Defendants also argue that an award of 1990 rates results in a windfall to plaintiffs' counsel rather than merely compensating them for the effects of inflation or the loss of use of the funds. Proof that an award at current rates will result in a windfall to the prevailing attorneys may be ground to deny use of current rates. Murray v. Weinberger, 741 F.2d 1423 (D.C.Cir.1984); cf. Thompson v. Barrett, 599 F.Supp. 806, 813-14 (D.D.C.1984) (application of historic rates in lengthy case proper because use of current rates for attorneys' current experience would produce a windfall). However, because defendants fail to provide the court with any evidence to substantiate their allegation, we decline to address it.
 
 
 [20]
 We need not decide the validity of defendants' argument that this issue raises a defect in the district court's subject matter jurisdiction that properly may be raised at any time. Moreover, given the application of this exception, plaintiffs' argument that this court's decision in Davis v. Mason County, 927 F.2d 1473 (9th Cir.1991) is distinguishable is without merit
 
 
 [21]
 The district court also ordered the defendants to pay plaintiffs $253,429.42 in costs and disbursements and it issued a writ of execution for the plaintiffs' limited to the amount of unpaid costs. Defendants only mention this writ in passing and their challenge here appears limited to the writ of execution regarding the interim fees and the potential threat of such a writ of execution under the Periodic Fees Order for collection of the remainder of the fees awarded in the Amended Order