Robin LUCAS, et al., Plaintiffs,

v.

O. Ivan WHITE, et al., Defendants.

No. C96–2905 TEH.

United States District Court,
N.D. California.

April 14, 1999.

Michael W. Bien, Donna Petrine, M.J. Tony Paikeday, Rosen, Bien & Asaro, Geri L. Green, Law Offices of Geri Lynn Green, San Francisco, CA, for plaintiffs.

John H. Hemann, U.S. Attorney's Office, San Francisco, CA, Nina S. Pelletier, U.S. Department of Justice, Washington, DC, for defendants.

## ORDER

HENDERSON, District Judge.

This matter comes before the Court on the plaintiffs' Motion for Interim Attorneys' Fees, Litigation Expenses and Costs under 28 U.S.C. §§ 2412(d) of the Equal Access to Justice Act ("EAJA"). Having carefully considered the parties' written and oral arguments, the supporting documentation before the Court, and the record herein, the Court grants plaintiffs' request for interim attorneys' fees and costs consistent with this Order.

## I. BACKGROUND

Plaintiffs Robin Lucas, Valerie Mercadel, and Raquel Douthit, filed this action on August 13, 1996, seeking damages and injunctive relief from present and former officials of the United States Department of Justice, Bureau of Prison ("BOP"). The complaint alleges that BOP officials violated their constitutional rights by subjecting them to a pattern of serious sexual assaults, sexual harassment and unwelcome sexual advances orchestrated and facilitated by prison officials. Amended Complaint ¶¶ 33–35, 61–63, 90–92, 127–165.

Specifically, plaintiffs allege the following: In August and September of 1995, they were each transferred to the J–2 Special Housing Unit ("SHU") at Federal Detention Center ("FDC") Pleasanton. FDC Pleasanton, located in Pleasanton, California, is generally used to confine male inmates, and at the time of plaintiffs' transfers, there were only a few women housed there among the otherwise all-male prisoner population. Amended Complaint ¶¶ 29–31, 57–59, 86–88. Correctional offi- cers allowed the male prisoners to roam the corridors and harass plaintiffs through the food port or other opening in the cell doors. Male prisoners repeatedly propositioned plaintiffs for sex and one plaintiff was physically assaulted on the head. Amended Complaint ¶¶ 35, 63, 92. The correctional officers also gave male prisoners access to plaintiffs' cells without their consent in the middle of the night, which resulted in several sexual assaults. Amended Complaint ¶¶ 35, 63, 92. The plaintiffs were also sexually harassed by correctional officers. For example, on one occasion, an officer demanded that plaintiff Mercadel show him her breasts or genitals in order to receive a prison issued t-shirt. When she refused to do so, she was not given the t-shirt. Amended Complaint ¶ 67.

Plaintiffs repeatedly asked prison personnel to stop the above conduct and in late August 1995, Lucas made an official complaint regarding the practice of allowing male inmates into her cell in the middle of the night. Within days, her complaint became common knowledge among the male prisoners and correctional personnel; nonetheless, she was not transferred to another place of confinement. Amended Complaint ¶¶ 38, 40–43, 66. On or about September 22, 1995, Lucas' cell door was opened while she was asleep and three men entered her cell, and restrained and handcuffed her from behind. She was then brutally beaten, raped, and sodomized. Her life was also threatened and she was informed that the attack was in retaliation for her complaint. Amended Complaint ¶ 44. On or about November 17, 1995, after the intervention of their attorneys, plaintiffs were transferred to Alameda County Jail, Santa Rita. Federal authorities subsequently conducted a criminal investigation in which plaintiffs cooperated. Amended Complaint ¶¶ 48, 83, 109. Plaintiffs further alleged that the above conduct, and the lack of appropriate training, policies, and procedures that allowed such conduct to occur, violated their rights

under the First, Fourth, Fifth and Eighth amendments of the United States Constitution.

Shortly after the action was filed, the parties agreed to mediate the case through this court's ADR program. The mediator, Douglas R. Young, held five mediation sessions over several months, beginning in December 1996 and concluding in June 1997. On October 31, 1997, at the suggestion of defendants, plaintiffs filed an Amended Complaint adding a claim against the United States under the Federal Tort Claims Act in order to facilitate resolution of the claim for damages.[1] Thereafter, the parties continued to negotiate the substantive and procedural terms of the settlement over the next several months. One factor that complicated the settlement of the matter was the passage of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 et seq., and its provisions pertaining to consent decrees in particular. The parties ultimately entered into a private settlement agreement in February 1998.

The agreement requires the BOP to implement a wide range of reforms affecting every federal prison. The reforms involve changes to policies, procedures, and personnel training that are designed to reduce the risk to female prisoners of sexual assaults and harassment by correctional staff and male prisoners, and to provide appropriate programming, counseling, and services to female prisoners who are victims of sexual assault. Specifically, defendants agreed to the following reforms on a national level: (1) establishment of a national training program to prevent the sexual assault of female prisoners, (2) provision of psychological and medical services for victims of sexual assault, (3) revision and amendment of the program statement for victims of sexual assault, and (4) adoption of measures to protect victim confidentiality. The government also agreed to the comprehensive monitoring of these reforms.

At the local level, defendants agreed to make the following changes at FCI Pleasanton: (1) discontinue housing women prisoners in the J–2 SHU where plaintiffs were housed, (2) establish a confidential mechanism for inmates to report sexual assaults, and (3) establish a specialized training program at FCI Dublin to prevent further sexual assaults. Finally, defendants agreed to pay plaintiffs a total of $500,000 in damages. Pursuant to their contingency fee agreement with plaintiffs, counsel for plaintiffs received a fee of 25 percent of this recovery, or $125,000. Bien Decl. ¶ 47. Since finalization of the settlement, plaintiffs' counsel have been monitoring compliance with the agreement. As part of this function, plaintiffs' counsel review progress reports and drafts of new policies, procedures, and training materials. Bien Decl. ¶ 28 and Exh. C.

On November 3, 1998, plaintiffs filed the instant motion seeking interim fees under the EAJA for time expended on the claims for injunctive relief against BOP officials in their official capacity. *Ramon by Ramon v. Soto,* 916 F.2d 1377, 1382–83 (9th Cir.1989) (party prevailing in suit against governmental officials acting in their official capacity may recover fees under EAJA). They do not seek fees for any time expended on their claim for damages. Specifically, plaintiffs seek the following amounts (after billing judgment) for time and expenses relating to the claims for injunctive relief:

*Work on the merits*
(through March 23, 1998)

| | |
|---|---|
| Fees: | $544,703.06 |
| costs | 31,384.85 |

*Work on monitoring*
(through March 24, 1998)

| | |
|---|---|
| Fees:$ 34,828.25 | |
| costs: | 2,955.73 |

---

1. Additional BOP defendants in their official capacities were also added. Bien Decl. ¶¶ 18–19

*Work on fees*
(through October 23, 1998)

| | |
|---|---|
| Fees: | $ 58,511.16 |
| costs: | $ 652.94 |
| Total fees | $638,042.47 |
| Total costs | 34,993.52 |
| TOTAL: | $673,035.99 |

## II. DISCUSSION

 Under the EAJA, prevailing plaintiffs are entitled to recover their attorneys' fees and costs unless the government's position was substantially justified, special circumstances would make an award unjust, or the application for fees is not timely filed. 28 U.S.C. §§ 2412(d)(1)(A), (1)(B); *Commissioner, I.N.S. v. Jean*, 496 U.S. 154, 158, 110 S.Ct. 2316, 2319, 110 L.Ed.2d 134 (1990); *Oregon Natural Resources Council v. Madigan*, 980 F.2d 1330, 1331 (9th Cir.1992); *Thomas v. Peterson*, 841 F.2d 332, 335 (9th Cir.1988) ("EAJA creates a presumption that fees will be awarded unless the government's position was substantially justified"). Once a court finds that a party is entitled to attorneys' fees, it must then determine a reasonable fee. This latter inquiry focuses on the reasonable number of hours expended and the appropriate hourly rate. We first address plaintiffs' entitlement to fees, and then the issue of a reasonable fee.

### A. Entitlement to Fees

#### (1) Sovereign Immunity

Defendants argue that because the United States has not waived its sovereign immunity for fee awards in tort actions, and this action sounds in tort, that plaintiffs' application for fees is barred by sovereign immunity. *See* 28 U.S.C. § 2412(d)(1)(A)[2]; *Campbell v. United States*, 835 F.2d 193, 195–96 (9th Cir.1987) (tort actions excluded from EAJA because

Congress believed legal remedies available in tort cases were adequate to encourage meritorious suits).

This action sounds in tort, defendants contend, because certain of the factual allegations in the complaint implicate tortious conduct and plaintiffs sought money damages in compensation. We are not persuaded, however, that a plaintiff is automatically ineligible for fees under the "cases sounding in tort" exception any time the factual allegations involve conduct that could be tortious and the complaint includes a claim for damages. The case of *Ramon by Ramon v. Soto*, 916 F.2d 1377 (9th Cir.1989), is instructive on this point. There, the plaintiffs, a class of students at Phoenix Indian High School, alleged that two students were sent home from school after breaking into the school kitchen to make sandwiches. *Id.* at 1379–80. Upon their readmittance to the school, both students allegedly were "harassed, intimidated, and physically abused by defendants ..." One defendant was also accused of handcuffing a student to a fence for three hours. *Id.* at 1380. Plaintiffs alleged that the defendants' disciplinary policies that led to these and other incidents were unconstitutional, and sought damages under *Bivens* and injunctive relief under the Fifth Amendment. *Id.* at 1380. The *Bivens* claims were subsequently dismissed but plaintiffs entered into a settlement agreement which provided for injunctive relief to remedy the Fifth Amendment violations. *Id.* at 1380, 1382–83. While certain of the underlying alleged misconduct clearly involved tortious acts, and the plaintiffs had sued for damages in addition to injunctive relief, the Court nowhere suggested that plaintiffs were thereby automatically ineligible for fees under EAJA because the case "sounded in tort." Notably, however, the Court expressly ob-

---

2. This section provides in part that "Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded....,

incurred by that party in any civil action (other than cases sounding in tort)....unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."

served that "[p]laintiffs' complaint was *aimed primarily* at obtaining equitable relief against the United States in order to put an end to official practices believed to violate BIA regulations and the Fifth Amendment." *Id.* at 1382–83 (emphasis added).[3]

■ The same situation is present here. Although defendants' alleged unconstitutional practices[4] led to tortious conduct, and plaintiffs' complaint included *Bivens* claims for damages, plaintiffs' action was clearly "aimed primarily at" obtaining equitable relief against government officials to end practices in the federal prison system that violated the plaintiffs' constitutional rights under the Fourth, Fifth, and Eighth Amendments. As such, it would be inaccurate, as in the case of *Ramon*, to label the plaintiffs' *entire action* as a "case sounding in tort" simply because the alleged unconstitutional conduct manifested itself in actions that can be described as tortious[5] and plaintiffs' complaint included a secondary claim for damages.[6]

Defendants alternatively argue that plaintiffs' complaint should be categorized entirely as a tort action because the claims for injunctive relief can not stand alone but instead are instead "wholly dependent on their claims for [tort] damages." The Court, however, finds no basis for concluding that plaintiffs' constitutional claims for injunctive relief are simply derivative of a tort damage claim and could not stand alone.[7] Nor have defendants offered any such basis. Finally, we are not convinced that plaintiffs lacked standing for their injunctive relief claims under *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

■ As defendants note, Congress passed the EAJA to diminish the deter-

---

3. *See also id.* at 1382, n. 6 (fact that *Bivens* damages claims were "extinguished" did not significantly reduce fees to which plaintiffs were entitled under EAJA because plaintiffs' *Bivens* theory was "a subsidiary part of their case").

4. The unconstitutional practices alleged include a failure to properly evaluate, train, discipline and supervise custodial personnel and to investigate claims, and protect the personal security interests of the plaintiffs in violation of the Fourth, Fifth and Eighth Amendments. *See* plaintiffs' complaint at ¶¶ 127–165.

5. Indeed, it is not uncommon for constitutional claims to implicate tortious conduct. For example, a claim seeking injunctive relief on the ground that federal prison officials are violating the Eighth Amendment by engaging in a pattern of excessive force (e.g. unjustified assaults) against inmates is not transformed into a "case sounding in tort" because the underlying factual allegations involve tortious acts. *See also Kreines v. U.S.*, 33 F.3d 1105 (9th Cir.1994) (EAJA's legislative history, which states that "sounding in tort" exception does not encompass "constitutional torts," may have been intended to make clear that the "sounding in tort" exception does not apply to injunction actions against government employees in their official capacity for tortious conduct).

6. *See also Andrews v. U.S.*, 122 F.3d 1367, 1374–75 (11th Cir.1997) (awarding fees under EAJA for prevailing on CERCLA claim where facts of CERCLA claim overlapped with tort claim for damages); G. Sisk, The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part One), 55 *Louisiana Law Review* (Nov.1994) at 248 ("The statutory exception [for tort actions] reasonably applies only to preclude an award of attorney's fees for legal expenses incurred with respect to a claim seeking relief under principles of tort law, not for separable claims seeking distinct non-tort relief that are merely joined to a tort claim in a single lawsuit assigned a single court docket number").

7. The case of *Campbell, supra,* 835 F.2d 193, cited by defendants is readily distinguishable. In that case, the plaintiff successfully sued the government to recover interest on a judgment previously obtained under the Federal Tort Claims Act ("FTCA"). The plaintiff then sought to recover fees under EAJA for time spent in the action to recover interest. The Court denied the fee claim on the ground that the action to recover interest on the FTCA judgment was essentially an extension of the underlying FTCA claim. *Id.* at 196. Here, the plaintiffs' claims for injunctive relief are based on independent constitutional theories, not the FTCA. Hence, they are not simply an extension of plaintiffs' claim under the FTCA or *Bivens*.

rent effect of seeking review of unreasonable government action because of the expense involved in securing the vindication of important rights. *See* Defs' Oppo. at 9; *Sullivan v. Hudson,* 490 U.S. 877, 883, 109 S.Ct. 2248, 2253, 104 L.Ed.2d 941 (1989). While defendants do not dispute that the settlement in this case vindicated important rights, they suggest that plaintiffs' contingency agreement should have provided counsel with sufficient incentive to litigate this case. This agreement, however, which pertained only to the claim for damages, can not fairly be said to have provided an incentive to take on the much more difficult and involved task of seeking comprehensive, nation-wide reforms, and then monitoring those reforms. Indeed, absent the EAJA, plaintiffs' counsel would have had little incentive to dedicate hundreds of hours to this additional effort which has benefitted not only the plaintiffs but all women incarcerated in federal prisons.

Accordingly, we conclude that plaintiffs' request for fees with respect to time spent on their constitutionally-based claims for injunctive relief against federal defendants in their official capacity is not barred by sovereign immunity.

### (2) *Prevailing Party*

■ A plaintiff qualifies as a prevailing party if she succeeds on " 'any significant issue in the litigation which achieve[d] some of the benefit the parties sought in bringing the suit.' " *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989). In this case, defendants do not dispute that plaintiffs qualify as prevailing parties for purposes of a fee award under the EAJA. As discussed above, plaintiffs achieved a broad settlement that involves extensive injunctive relief designed to redress the claims raised in their complaint. *See also* Settlement Agreement at § I(C), Pls' Mtn, Exh.4 ("The Bureau of Prison's agreement to the terms in this settlement is undertaken in good faith *to redress* plaintiffs' concerns arising from certain actions alleged to have occurred ...") (emphasis added); *see also* Parker Decl. ¶ 14 (relief achieved is "exceptional, particularly without going to trial"); George Decl. ¶ 7 (plaintiffs obtained "extraordinary" injunctive relief).

### (3) *Substantial Justification*

■ When a private litigant prevails in a civil action against the United States, "the prevailing party must be awarded fees and expenses 'unless the Court finds that the position of the United States was substantially justified.' " *Meinhold v. U.S. Dep't of Defense,* 123 F.3d 1275, 1277, *amended by,* 131 F.3d 842 (9th Cir.1997); *Oregon Natural Resources Council,* 980 F.2d at 1331. Thus, once a party establishes its status as a prevailing party under the EAJA, a rebuttable presumption arises that it is entitled to an award of fees. *Id.*

■ The "position" of the United States refers to the agency's underlying position—i.e. the agency action or inaction upon which the litigation is based—and the agency's litigation position. *Oregon Natural Resources Council,* 980 F.2d at 1331; *Thomas,* 841 F.2d at 334–35. Thus, a finding that "either the government's underlying conduct or its litigation position was not substantially justified is sufficient to support an award of EAJA fees." *Cervantez v. Sullivan,* 739 F.Supp. 517, 521 (E.D.Cal.1990); *see also Jean,* 496 U.S. 154, 110 S.Ct. at 2319, n. 7 (congressional intent is to provide for fees when unjustifiable agency action forces litigation, but then the agency tries to avoid liability by reasonable behavior during litigation); *Wilderness Society v. Babbitt,* 5 F.3d 383, 388 (9th Cir.1993)(fact that government's litigation position may have been justified is not sufficient because court must also consider underlying government conduct); *Andrew v. Bowen,* 837 F.2d 875, 880 (9th Cir.1988); *see also Marcus v. Shalala,* 17 F.3d 1033, 1036 (7th Cir.1994); *Jones v. Lujan,* 887 F.2d 1096, 1098 and n. 2 (C.A.D.C.1989).

■ The term "substantial justification" requires the agency to "show that its position has a reasonable basis in law and fact." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *Abela v. Gustafson,* 888 F.2d 1258, 1264 (9th Cir.1989). While this means less than "justified to a high degree," it also means "more than merely undeserving of sanctions for frivolousness.' " *Jean,* 496 U.S. at 158, 110 S.Ct. at 2319, n. 6; *Pierce,* 487 U.S. at 565, 108 S.Ct. 2541. Rather it means "justified in substance or in the main" that is, justified to a degree that would satisfy a reasonable person. *Id.* It is the government's burden to show that such a reasonable basis exists. *Meinhold,* 123 F.3d at 1277.

■ As described above, the alleged conduct underlying the instant lawsuit consisted of placing women in an otherwise all-male security housing unit, opening plaintiffs' cell doors for male prisoners' access, allowing for the physical and sexual harassment of plaintiffs, allowing correctional officers and male prisoners to assault and rape plaintiffs in retaliation for previous claims of wrongdoing, and failing to properly evaluate, train, discipline, and supervise custodial personnel so as to prevent such occurrences.

Defendants primarily argue that we should find they were substantially justified with respect to the underlying conduct because the United States never admitted any wrongdoing and plaintiffs' never proved their allegations. *See* Defs' Oppo. at 16 ("The conduct allegedly giving rise to this actions has been neither proven or admitted"). Rather, defendants repeatedly argue, the record is "bereft" of any evidence to support the plaintiffs' charges. *See e.g. id.* at 16. Moreover, they emphasize, no criminal charges were ever brought despite a criminal investigation.

Defendants' arguments lack both legal and factual support. First, the fact that the government never admitted to any wrongdoing hardly demonstrates that its underlying conduct was substantially justified, and defendants cite no authority to support this novel proposition. Indeed, defendants routinely deny liability when they settle cases; such self-serving denials, however, can not substitute for a showing that the underlying conduct was justified to a degree that would satisfy a reasonable person. Second, the fact that the Department of Justice decided not to press criminal charges does not indicate that the underlying factual allegations lack merit given the different legal standards that govern criminal cases. Moreover, a decision whether or not to prosecute can rest on any number of variables other than the factual merits of a case. Here, for example, the BOP's internal investigation may have compromised the criminal investigation.[8]

■ Third, the court is aware of no authority, and defendants cite none, that requires a plaintiff to definitively "prove" the factual allegations in the complaint in order to recover fees under the EAJA, particularly where the case has been resolved through settlement. Indeed such a requirement would be inimical to encouraging settlement. On the contrary, it is the government's burden to demonstrate that its underlying conduct was reasonable. *Meinhold,* 123 F.3d at 1277. Here, however, defendants have declined to submit any evidence to support its conclusory assertions that BOP official policies were adequate and that plaintiff's allegations were false or unfounded. Rather, the only evidence before the Court supports the validity of plaintiffs' claims. *See* Bien Re-

---

8. According to a declaration filed by plaintiffs' counsel, they were informed in a meeting with Michael Yamaguchi and Bert Glenn of the U.S. Attorney's Office on April 23, 1997, that the pending criminal investigation had been compromised by the administrative investigation that the Internal Affairs for the Bureau of Prisons had previously conducted. In particular, officers who had been questioned and provided incriminating statements had been immunized. Reply Decl. of Green at ¶ 10.

ply Decl. ¶ 8 and Exh, D.[9] Accordingly, this Court concludes that the government has failed to meet its burden of demonstrating that the underlying conduct giving rise to the claims for injunctive relief was substantially justified.

■ The government also points to its litigation position as evidence of substantial justification, emphasizing that it agreed to mediate the case, and ultimately agreed to comprehensive relief. This factor alone, however, does not warrant a denial of fees. *Jean,* 496 U.S. at 159, n. 7, 110 S.Ct. at 2319. Rather, the fact that the government settles a case demonstrates neither that the position of the government was reasonable or unreasonable. *Hanson v. Comm'r of Internal Revenue,* 975 F.2d 1150, 1155–56 (5th Cir. 1992). Defendants also state that they were "cooperative, sympathetic and helpful" throughout the pendency of the action. Defs' Oppo. at 16. They again fail, however, to support this assertion with any declarations or other evidence, and it is contradicted by the declarations of plaintiffs' counsel which state that while counsel for defendants were cordial and professional, the litigation, including the mediation process, was hard fought and BOP officials were less than cooperative. *See* Bien Reply Decl. at ¶ 14; Green Reply Decl. ¶¶ 4–5. In any event, a reasonable litigation position, alone, would not justify a denial of fees in this case given the government's failure to justify its underlying conduct and the particularly egregious nature of the conduct.

Accordingly, the Court concludes that defendants have not met their burden of demonstrating that plaintiffs should be denied fees because the position of the government was "substantially justified."

### (4) *Special Circumstances*

■ A court may deny fees to a prevailing party even where the government's position was not substantially justified, if special circumstances would make an award unjust. 28 U.S.C. § 2412(d)(1)(A). This provision, however, should only be invoked with caution. *J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1474 (10th Cir.1985); *Martin v. Heckler,* 773 F.2d 1145, 1150 (11th Cir.1985) (special circumstances exception should be narrowly construed).

■ Here, defendants contend that two "special circumstances" would make a fee award unjust. First they argue that because plaintiffs' counsel already recovered fees under their contingency fee arrangement (governing the damage claims), any additional award of fees on the injunctive relief claims would be unjust. Defendants cite no authority for this assertion, and fail to acknowledge *Venegas v. Mitchell,* 495 U.S. 82, 90, 110 S.Ct. 1679, 1684, 109 L.Ed.2d 74 (1990), which recognizes that a party may collect statutory fees in addition to a contingency fee. Moreover, since plaintiffs are not recovering any fees for time expended on the claims covered by the contingency fee agreement, there is no potential for double recovery. Nor is this an instance in which plaintiffs' counsel recovered an unusual windfall under a contingency agreement that might create some special circumstance or specter of unfairness.

■ Second, defendants argue that because this matter involved "no litigation, no thicket of regulations, no motion practice or pre-trial preparation and no obstreperous opposing counsel," plaintiffs' request for fees should be denied as "unconscionable." Defs' Oppo. at 17. This borderline frivolous argument—asserted

---

9. *Plaintiffs also represent that there is additional extensive evidence including, but not limited to statements by Mercadel and Douthit, medical and mental health reports, and prison records. Bien Reply Decl. at ¶ 8. However, because Mercadel and Douthit re-* main incarcerated, and thus at risk of additional threats and retaliation, plaintiffs request that the Court review this evidence, if it finds it necessary to do so, under seal or *in camera.* The Court concludes that such review is not necessary to resolve this motion.

without any supporting evidence—is contradicted by the record which amply reflects that plaintiffs' were required to engage in an intensive and often complex litigation effort to obtain the comprehensive, nation-wide settlement agreement achieved in 1998. Defendants ignore, for example, the formal and informal discovery efforts by plaintiffs' counsel that resulted in the production of approximately five thousand pages of documents. Plaintiffs' counsel also engaged in substantial pretrial preparation, including obtaining expert witnesses and having their clients examined, undertaking extensive witnesses interviews, and conducting extensive legal research and analysis. *See e.g.* Bien Reply Decl. ¶¶ 5–7; Green Reply Decl. ¶¶ 4–9. Motions were also drafted in connection with the mediation. Indeed, defendants' suggestion that the agreement somehow magically appeared after 18 months, without much, if any, litigation effort on plaintiffs' behalf can perhaps best be characterized as fanciful.

Accordingly, the Court concludes that defendants have not identified any special circumstances that would make an award of fees unjust.

### B. *Calculation of a Reasonable Fee*

█ Once a plaintiff satisfies the conditions for recovering attorneys' fees under § 2412(d), the Court must determine what fee is "reasonable." The process for determining a reasonable fee under 28 U.S.C. § 2412(d) is the same as that followed in cases awarding fees under 42 U.S.C. § 1988. *Jean,* 496 U.S. at 160, 110 S.Ct. at 2320 ("once a private litigant has met the multiple conditions for eligibility for EAJA fees, the district court's task of determining what fee is reasonable is essentially the same as that described in *Hensley* [v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ]").

█ Accordingly, we must determine the number of hours reasonably expended

in the litigation and multiply that figure by a reasonable hourly rate. *Hensley,* 461 U.S. at 433–34, 103 S.Ct. 1933; *Gates v. Deukmejian,* 987 F.2d 1392, 1397 (9th Cir. 1992). This figure, which is commonly referred to as the lodestar, may then be increased or decreased based on certain factors that are not subsumed within the initial calculation of the lodestar. *D'Emanuele v. Montgomery Ward & Co., Inc.,* 904 F.2d 1379, 1383 (9th Cir.1990). However, such upward or downward adjustments are "the exception rather than the rule since the lodestar amount is presumed to constitute a reasonable fee." *Id.; Gates,* 987 F.2d at 1397.

### (1) *Number of Reasonable Hours Expended*

█ It is plaintiffs' burden to " 'document[ ] the appropriate hours expended in the litigation' by submitting evidence in support of those hours worked." *Gates,* 987 F.2d at 1397. The appropriate number of hours includes all time "reasonably expended in pursuit of the ultimate result achieved, in the same manner that an attorney traditionally is compensated by a fee-paying client for all time reasonably expended on a matter." *Hensley,* 461 U.S. at 431, 103 S.Ct. 1933. However, it does not include hours that are "excessive, redundant, or otherwise unnecessary because, for example, the case is overstaffed." *Id.* at 433, 437, 103 S.Ct. 1933.

█ The party opposing the fee application "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates v. Rowland,* 39 F.3d 1439, 1449 (9th Cir.1994)(quoting *Gates v. Deukmejian,* 987 F.2d 1392, 1397–98 (9th Cir.1992)); *United Steelworkers of America v. Phelps Dodge Corp.,* 896 F.2d 403, 407 (9th Cir.1990); N.D. Cal. L.R. 7–5.[10] Conclusory and unsubstantiated ob-

---

**10.** N.D. Cal. L.R. 7–5 provides that "The par-

ty opposing a fee application has a burden of

jections are not sufficient to warrant a reduction in fees. *Gates,* 987 F.2d at 1397–98.

Plaintiffs' counsel have submitted detailed time sheets and supporting declarations demonstrating that they have spent the following hours on this action, after billing judgments [11]:

| | |
|---|---|
| Time spent on the merits (through 3/23/98) | 2,635.25 |
| Time spent on monitoring (through 3/24/98) | 130.55 |
| Time spent on fees (through 10/23/98) | 438.60 |
| TOTAL: | 3,204.40 |

Defendants raise no objection to the thorough documentation of the hours; nor do they dispute plaintiffs' allocation of hours between the injunctive and damages portions of the case. They do, however, contend that the number of hours for which reimbursement is sought is unreasonable for a variety of other reasons. Since defendants have not supported these objections (save one), with any declaration or other supporting evidence, they fail on this ground alone. *Gates,* 39 F.3d at 1449. As discussed below, however, they also fail on the merits given the record before the Court.

 First, defendants argue that plaintiffs should not recover for time spent in connection with the parallel criminal investigation because it was unnecessary to the

civil action. Rather, they characterize this effort as analogous to discretionary lobbying which is not compensable. *See Portland Audubon Society v. Lujan,* 865 F.Supp. 1464, 1475 (D.Or.1994). Plaintiffs, however, convincingly demonstrate that the ongoing criminal investigation and the civil case were sufficiently intertwined that it was entirely reasonable for plaintiffs' counsel in the civil action to get involved in the criminal investigation in order to ensure that their clients' rights in the civil action were adequately protected and not compromised by that investigation.[12] *See also* Bien Reply Decl. at ¶ 10 (representation of clients in connection with the criminal investigation contributed directly to success in the civil litigation). *See also* Green Decl. ¶¶ 13–18; Green Reply Decl. ¶ 11. Although no criminal charges were ever brought, plaintiffs' counsel and the Assistant U.S. Attorney representing the government in the civil case were given access to the full criminal investigative files. Bien Decl. ¶¶ 17–18; Green Decl. ¶¶ 13–14, 17.[13]

 Second, defendants argue that plaintiffs should not recover for any time spent prior to the date of entries stating "research and drafting complaint." However, time reasonably spent on pre-complaint investigation, legal research and informal discovery relevant to developing the theory of the case is properly recoverable, *see e.g. Hill v. Southside Public*

rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits."

**11.** In the exercise of billing judgment counsel Michael Bien (1) made discrete write-downs of time based upon the same careful review of billing records conducted prior to sending a final bill to a fee-paying client, (2) deducted all time related to contacts with the media, and (3) deducted all time for any timekeeper who billed less than ten hours on the case. As previously noted, counsel also eliminated any time specifically expended on damages issues. These billing judgment reductions amounted to 674.89 hours or approximately

15.5% of the fee claim. Bien Decl. at ¶¶ 47–48; *see also* Green Decl. at ¶¶ 28, 29–30.

**12.** Plaintiffs' counsel represented plaintiffs in connection with polygraph examinations, and in interviews and meetings with the FBI, OIG (Office of Inspector General) and the United States Attorney.

**13.** The Court also notes that plaintiffs' counsel states that "in an effort not to interfere with the pending criminal case, [they] requested that the United States enter into a tolling agreement to preserve any civil causes of action and delay[] filing the civil case as long as possible. The United States refused to do so." Bien Reply Decl. ¶ 11.

*Schools,* 688 F.Supp. 493, 500 (E.D.Ark. 1988), and defendants cite no authority to the contrary. Indeed, Fed.R.Civ.P. 11 *requires* that counsel undertake sufficient pre-complaint investigation such that they can properly represent that all claims asserted are "warranted by existing law or a nonfrivolous argument for [its extension or modification]," and that the factual allegations in the complaint have "evidentiary support" or are likely to have evidentiary support after reasonable opportunity for further investigation or discovery.

Third, defendants argue that time spent on disciplinary and transfer issues relating to plaintiff Valerie Mercadel are non-compensable because they concern issues that arose after the settlement agreement and are not part of this action. However, the disciplinary issue arose when plaintiff refused to cooperate with a cross-gender pat search that was directly covered by the settlement agreement, and raised general issues relating to this policy. As such, these hours are properly related to the monitoring of the settlement agreement. The Court is also satisfied that time spent on the related transfer issues also falls within the monitoring of the settlement given the record presently before the Court.

■ Fourth, defendants object to numerous monitoring phase hours relating to communications with members of the Yale Prison Law Project or inmates on the ground that such time is not connected to this action. However, as the declarations of counsel explain, the Yale Law School clinic which is located near FCI Danbury has been utilized to assist in the monitoring at that site, which saves the cost of travel to Danbury, Connecticut. Bien Re-

ply Decl. ¶ 12.[14] Nor is there any reason to assume, as a general matter, that communications with inmates are not related to plaintiffs' monitoring functions since assessing defendants' compliance with their settlement obligations may well require communicating with those inmates affected by the settlement. Finally, defendants' assertion that plaintiffs' counsel substantially inflated their time spent on monitoring is a conclusory, unsupported allegation that does not justify a reduction in fees. *Gates,* 987 F.2d at 1397–98.[15]

Fifth, and last, defendants argue that the overall number of hours claimed is excessive because (a) this matter involved no litigation, discovery, motion practice or pretrial activity, and (b) plaintiffs achieved only limited success because most of the policy changes agreed to in the settlement agreement were already underway. With respect to the former assertion, while perhaps rhetorically dramatic, it is, as discussed above, unsupported and factually wrong. *See also* Wolinsky Decl. ¶ 8 ("reaching a negotiated settlement with a government agency without going to trial can be as complex as going through trial").

With respect to the latter, defendants have submitted a declaration from Teresa Katsel, who is a Special Needs Offender Coordinator for the BOP's Correctional Programs division. She states that the BOP recognized sexual abuse of inmates as a significant correctional management issue in 1996 and that "recommendations" were presented to the Director of the BOP in November 1996, and that in early 1997 she began developing a "plan" for the BOP to address "systemically female offender issues and sexual misconduct issues" which was approved in April 1997. Actual train-

---

14. Plaintiffs' fee request does not, however, seek to recover for any time spent on monitoring by the Yale Law Clinic.

15. Plaintiffs have, however, identified an additional 2.76 hours expended by Green and Goering during the monitoring phase which they have deleted from their fee request in the exercise of billing judgment, along with a typographical error that resulted in the inadvertent inclusion of 14.12 hours expended by Green on 4/29/98. *See* Green Reply Decl. ¶¶ 16–18; plaintiffs' letter of January 5, 1999. Their declarations persuasively indicate that the remainder of the time at issue was properly expended on monitoring functions. Bien Reply Decl. ¶ 12; Green Reply Decl. ¶¶ 16–18.

ing plans were developed later in the year and training began in 1998. She further states that training on these subjects including sexual misconduct, investigation of allegations of sexual misconduct and cross-gender searches, were "developed separate and apart from the settlement of this litigation." Katsel Decl. ¶¶ 5–8.

While defendants rely on this declaration to demonstrate that plaintiffs' action was largely irrelevant, the Court is not so persuaded. First, plaintiffs' counsel initially communicated with BOP and Department of Justice officials regarding the allegations underlying the complaint in November and December 1995. Bien Reply Decl ¶ 13, and Exh. E. Thus, while Ms. Katsel states that the BOP recognized sexual abuse of inmates as a significant issue in 1996, this is entirely consistent with plaintiffs having highlighted this issue in 1995. Moreover, while Ms. Katsel started developing training plans in 1997, this is the exact same period in which the parties were participating in the formal mediation sessions (December 1996—June 1997), and Ms. Katsel personally participated in one of the June sessions. Given this larger context, the Court finds it difficult to believe that the entirety of the training outlined in Ms. Katsel's declaration occurred in a vacuum unrelated to the plaintiffs' action and the extensive on-going mediation efforts. The settlement also had the additional effect of making the training policies binding upon the BOP and subjecting them to monitoring and enforcement.

In sum, the Court rejects defendants' contention that the overall hours spent on the merits were excessive because there was no "litigation" involved and because plaintiffs' success was limited. On the contrary, the unrebutted record indicates that the relief achieved by plaintiffs was extraordinary, particularly given that it was obtained without a trial. *See e.g.* Parker Decl. ¶¶ 11, 14; George Decl. ¶ 7. For

this, and all the other reasons discussed above, we conclude that the number of hours requested on the merits and monitoring phase is reasonable. *See* Parker Decl. ¶ 12; George Decl. ¶ 15, Wolinsky Decl. ¶ 16.

 The Court does find, however, that the number of hours expended in connection with this fee application is excessive. While plaintiffs' reasonably (and accurately) anticipated that this fee application would be vigorously opposed, the total of 438.60 hours appears high, particularly considering that it does not include time spent on the reply and argument. While defendants have not objected to the number of hours expended on the fees matter, the Court has an independent obligation to ensure that the fee award is reasonable. *See e.g. Clarke v. Frank,* 960 F.2d 1146, 1153 (2nd Cir.1992) (district court may use its own familiarity with the case and its experience with the case in calculating the number of reasonable hours). Accordingly, the Court will reduce the number of hours in this category by 10 percent.

### (2) *Reasonable Hourly Rate*

The EAJA provides that attorneys' fees shall not be awarded in excess of $75.00/hour unless the court determines that "an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Defendants do not object to a cost of living increase, acknowledging that such increases are "almost always awarded." Defs' Oppo. at 23. *See e.g. Rueda–Menicucci v. I.N.S.,* 132 F.3d 493, 496 (9th Cir.1997). They do, however, contend that no other special factor warrants a higher hourly rate and object to paying more than the statutory $75.00/hour rate for lead counsel Michael Bien and Geri Green.[16]

16. Plaintiffs request the statutory hourly rate (plus cost of living) of $131.34 for all other

attorneys that worked on the case (in excess of ten hours). Plaintiffs further seek compen-

■ In referring to "special factors," " 'Congress intended for courts to deviate from the statutory cap only if there was limited availability of attorneys having some distinctive knowledge or specialized skill needful for the litigation in question.' " *Rueda–Menicucci*, 132 F.3d at 496 (quoting *Pirus v. Bowen*, 869 F.2d 536, 540 (9th Cir.1989)). To obtain a departure from the statutory cap under this standard, the plaintiff must demonstrate that (1) plaintiffs' attorney has a "distinctive knowledge or specialized skill," (2) such knowledge and skills are necessary to the litigation, and (3) similar knowledge and skills could not have been obtained at the statutory rate. *Pirus*, 869 F.2d at 541–42.

■ With respect to the first factor, a lawyer who has outstanding skills as a litigator does not have a distinctive knowledge or specialized skill as contemplated by the EAJA. *See Jean v. Nelson*, 863 F.2d 759, 774 (11th Cir.1988), *aff'd* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990). Rather, courts look for a genuine expertise in a specific area that is both discrete and complex. *See e.g. Rueda–Menicucci*, 132 F.3d at 496 ("[w]e believe that a speciality in immigration law could be a special factor warranting an enhancement of the statutory rate"); *Pirus*, 869 F.2d at 542 (specialization in social security law); *Animal Lovers Volunteer Ass'n, Inc. v. Carlucci*, 867 F.2d 1224, 1226 (9th Cir.1989) (plaintiffs not entitled to exceed statutory cap absent showing that attorney had *specialized* in environmental work); *Sneede by Thompson v. Coye*, 856 F.Supp. 526 (N.D.Cal.1994) (Medicaid law); *U.S. v. Knote*, 879 F.Supp. 89 (E.D.Mo.1995) (environmental law); *Farmers Cooperative Dairy, Inc. v. Block*, 703 F.Supp. 379 (E.D.Pa.1989) (agricultural law).

(a) *Michael Bien*

■ The record before the Court amply demonstrates that plaintiffs' counsel Michael Bien is a genuine expert in the area of complex, institutional prison reform litigation. He has 15 years experience in this specialty and has handled numerous such cases either as lead or co-lead counsel. *See* Bien Decl ¶¶ 4–8.; Parker Decl. ¶ 13, George Decl., ¶ 6, Wolinsky Decl. ¶ 7; Perl Decl. ¶ 7. While defendants acknowledge that Bien is skilled in this "specialty," *see* Defs' Oppo. at 23, they argue against a higher hourly rate on the ground that no court has recognized this speciality as qualifying for a departure from the statutory cap. While no court has apparently ruled on the matter either way, this factor alone is not dispositive. We further conclude that a lawyer with genuine expertise in the specialty of complex institutional prison reform litigation has a distinctive skill or specialized knowledge for purposes of the EAJA. In particular, the Court's extensive experience with two cases involving institutional prison reform litigation, *Cherco v. County of Sonoma*, C80–334, and *Madrid v. Gomez*, 946 F.Supp. 1146 (N.D.Cal.1995), convinces it that the area of institutional prison reform litigation involves distinctive knowledge and specialized skills well beyond those possessed by lawyers who are otherwise highly experienced and talented. It involves, for example, special expertise in understanding prison bureaucracies and policies, and other intricacies of prison systems, as well as the experience and ability to effectively communicate with inmates and evaluate their claims and needs. *See also Gates*, 987 F.2d at 1405 (acknowledging that "the requisite expertise and experience" necessary to undertake "complex institutional prison reform litigation" was not available from law firms in the

---

sation for hours spent by law clerks at $100.00 hour and paralegals at $70.00, 90.00 and $110.00 per hour depending on experience. *See Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir.1988), *aff'd*, 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990)(usual billing

rates for law clerks and paralegals appropriate in EAJA case in order to minimize fees where work is of type that would otherwise be performed by an attorney and thus billed at higher rate). Defendants have not objected to these rates.

Sacramento, California area). Clearly, if only general legal experience and outstanding legal skills were necessary, the *Gates* court would not have reached this conclusion. *See also* George Decl. ¶¶ 13–14. We are thus satisfied that plaintiffs' counsel Michael Bien possesses the type of distinctive knowledge and specialized skills that Congress contemplated would warrant a deviation from the $75.00/hour statutory cap.

The court also finds that Mr. Bien's distinctive knowledge and specialized skills in complex institutional prison reform litigation was necessary to this litigation, and defendants have failed to rebut the evidence in the record on this point. *See e.g.* Parker Decl., ¶ 14 (case of this nature could not have been effectively litigated without Bien's specialized skill and distinctive knowledge); George Decl., ¶ 7; Wolinsky Decl. ¶ 7; Tamburello Decl. ¶ 6; Perl Decl., ¶ 8. Nor have defendants disputed the considerable evidence in the record that plaintiffs could not have obtained lawyers with Mr. Bien's qualifications who would have been willing to take this case at the $75.00/hour statutory rate. *See e.g.* Parker Decl. ¶ 15; Tamburello Decl. ¶ 11; George Decl., ¶ 8; Wolinsky Decl., ¶ 9. Indeed, very few attorneys in California practice in the area of institutional prison reform litigation, and even fewer that can afford to advance the substantial costs required to prosecute such an action. Wolinsky Decl. ¶ 9; George Decl. ¶ 8; Parker Decl. ¶ 15.

Accordingly, we conclude that plaintiffs' counsel Michael Bien should be compensated at "prevailing market rates for the kind and quality of the services furnished," 28 U.S.C. § 2412(d)(2)(A), rather than at the statutory hourly rate cap of $75.00/hour. In this regard, plaintiffs have submitted numerous declarations that provide persuasive evidence of the market rate in the Bay Area for litigators with experience equivalent to that possessed by plaintiffs' counsel. The hourly rate requested by Michael Bien ($325.00) is consistent with the market rate for attorneys with 18 years experience and similar qualifications. *See* Parker Decl. ¶ 16; George Decl. ¶ 9; Wolinsky Decl. ¶¶ 10, 12. While defendants have not disputed that the requested hourly rates reflect "prevailing market rates of the kind and quality of the services furnished," we must nonetheless make an independent finding that such rates are reasonable before any award is made. *Intel Corp. v. Terabyte Int'l, Inc.,* 6 F.3d 614, 622 (9th Cir.1993); *Dease v. City of Anaheim,* 838 F.Supp. 1381 (C.D.Cal. 1993). The Court is amply satisfied, given its familiarity with prevailing market rates in this area, and the record presented, that the requested hourly rate for Bien is reasonable, and represents the "prevailing market rates for the kind and quality of the services furnished." 28 U.S.C. § 2412(d)(2)(A).

(b) *Geri Green*

■ While Ms. Green is not an expert in institutional prison litigation, she has approximately 12 years experience, primarily in criminal law, with a particular expertise in criminal sexual assault. She also has some civil law experience. Green Decl. ¶¶ 4–8. While the Court would agree that an experienced criminal law attorney with a specific expertise in criminal sexual assault has a "specialized skill," it can not say that Green's particular expertise was "necessary to the litigation." *Pirus,* 869 F.2d at 541–42. While certain criminal law issues were implicated by the overlapping criminal investigation and the nature of the underlying allegations, this was not a criminal action but a civil action alleging violation of constitutional rights. Thus while Green's particular experience in criminal law was no doubt helpful to the civil case, the Court is not persuaded that it was necessary to the successful litigation of this particular action. As such, the Court declines to find that Green is entitled to an hourly rate that exceeds the statutory cap based on "special factors."

(c) *Fees on fees*

■ Nor are plaintiffs entitled to recover the prevailing market rate for time spent in connection with this fee petition.

Preparation of an application for attorney fees does not require specialized or distinctive knowledge within the meaning of the EAJA. *Douglas v. Baker,* 809 F.Supp. 131 (D.D.C.1992); *cf. Gates,* 39 F.3d at 1449 (court did not abuse discretion in concluding that specialized knowledge and experience were not required to litigate fee request and therefore local, rather than San Francisco, market rates would be used in determining section 1988 fee request).

### (3) *Adjustment of the Lodestar*

The lodestar is a presumptively reasonable rate and neither plaintiffs nor defendants seek an adjustment upward or downward. The Court is also independently satisfied that the lodestar represents a reasonable fee in this case. *See Gates v. Deukmejian,* 977 F.2d 1300, 1305 (9th Cir. 1992).

### (4) *Costs*

Plaintiffs request reimbursement of their out-of-pocket costs in the amount of $34,993.52. It is well established that such costs are recoverable as part of a fee award, and defendants have registered no objection to the amount of costs requested in plaintiffs' opening memorandum. Accordingly, plaintiffs shall be awarded their costs in this amount. *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1216, n. 7 (9th Cir.1986), *amended,* 808 F.2d 1373 (9th Cir.1987).

### III. *CONCLUSION*

For all of the reasons set forth above, the Court finds that plaintiffs are entitled to recover their interim attorneys' fees and costs under the EAJA. Plaintiffs are prevailing parties and the position of the United States was not substantially justified. Nor have defendants demonstrated that special circumstances would make an award unjust. The Court further concludes that plaintiffs' counsel have reasonably expended the following number of hours on this matter through March 24, 1998 (with respect to the merits and monitoring) and October 23, 1998 (with respect to the application for fees), and are entitled to recover for this time at the following hourly rates [17]:

| Rosen Bien & Asaro | Hours | Hourly Rate | Subtotal |
| --- | --- | --- | --- |
| Bien (merits/monitoring) | 616.55 | $325.00 | $200,378.75 |
| (fees) | 39.06 | 131.34 | 5,130.14 |
| Petrine | 79.20 | 131.34 | 10,402.12 |
| Paikeday | 611.75 | 131.34 | 80,347.25 |
| Fernholz | 17.30 | 131.34 | 2,272.18 |
| Margolis | 166.03 | 131.34 | 21,806.38 |
| Bunker (law clerk) | 127.80 | 100.00 | 12,780.00 |
| Plunkett (Sr.paralegal) | 161.00 | 110.00 | 17,710.00 |
| Derrico (Sr.paralegal) | 43.92 | 110.00 | 4,831.20 |
| Hollar (paralegal) | 211.54 | 90.00 | 19,038.60 |
| | | | |
| **Law Office of Geri Green** | | | |
| | | | |
| Green | 967.33 | $131.34 | $127,049.12 |
| Goering (paralegal) | 102.18 | 70.00 | 7,152.60 |

Total: $508,898.34

---

17. The following calculations are based on the summary charts attached to Bien's declaration with the following adjustments: (1) hourly rate for Green is limited to $131.34, (2) hourly rate for Bien is limited to $131.34 for time expended on fees, (3) hours expended on fees is reduced by 10% for each person claiming such hours, and (4) hours expended on monitoring are reduced for Green and Goering consistent with Green's Reply Decl. at ¶¶ 16–18 and counsels' letter of 1/5/99.

Accordingly, and good cause appearing, it is HEREBY ORDERED that plaintiffs are awarded interim attorneys' fees in the amount of $508,898.34, and interim expenses and costs in the amount of $34,993.52 for a total interim award of $ 543,891.86.

IT IS SO ORDERED.